1
2
3                                                    O
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11   DANIEL S.,                          Case No. 5:18-cv-01504-KES
12              Plaintiff,
13       v.                              MEMORANDUM OPINION AND
                                         ORDER
14   NANCY A. BERRYHILL, Acting
     Commissioner of Social Security,[1]
15
16              Defendant.
17

18       Because of legal error on Issue Three, the Court REVERSES the

19   Commissioner's decision and REMANDS this case for further administrative

20   proceedings consistent with this Opinion.

21                                  **I.**

22                            **BACKGROUND**

23       Plaintiff Daniel S. ("Plaintiff") applied for Social Security Disability

24   Insurance Benefits ("DIB") as a twenty-nine-year-old man.  Administrative Record

25   ("AR") 172.  Plaintiff alleged that he became disabled and unable to work on July

26       ───────────────────
             [1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy
27   Commissioner for Operations, performing the duties and functions not reserved to
     the Commissioner of Social Security."
28

3, 2011, due to right ear deafness, back pain, right leg pain, sleep apnea, and depression.  AR 172, 203; see also AR 406, 451 (noting that he injured his back in 2010 after a fall at work lifting heavy luggage at an airport job).

On March 21, 2017, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE").  AR 38-64.  On June 1, 2017, the ALJ issued an unfavorable decision.  AR 12-27.  The ALJ found that Plaintiff suffered from the medically determinable impairments of "history of hearing loss in the right ear, status post BAHA implant; lumbar spine spondylosis superimposed on congenital spinal stenosis with right leg radiculopathy; bilateral hip osteoarthritis; hypertension; chronic pain; depression and sleep apnea …."  AR 17. Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform a range of sedentary work with additional non-exertional restrictions.  AR 19-20.

Based on the RFC analysis and the VE's testimony, the ALJ found that Plaintiff could not do his past relevant work, but could work as an addresser, ticket checker, or lens inserter.  AR 26-27.  The ALJ concluded that Plaintiff was not disabled.  AR 27.

## II.

## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla, but less than a preponderance.  Lingenfelter, 504

F.3d at 1035 (citing <u>Robbins v. Comm'r of SSA</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).  Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." <u>Stout v. Comm'r of SSA</u>, 454 F.3d 1050, 1055 (9th Cir. 2006). Plaintiff bears the burden of establishing that the ALJ's decision is based on prejudicial legal error. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) (court may not reverse absent a harmful error, and plaintiff bears burden of establishing that an error is harmful).

## III.

## ISSUES PRESENTED

<u>Issue One</u>:  Whether the ALJ erred in finding that Plaintiff's bilateral hip osteoarthritis did not meet Listing 1.02(A).

<u>Issue Two</u>:  Whether the ALJ erred in finding that Plaintiff's spinal conditions do not meet listing 1.04(A).

<u>Issue Three</u>:  Whether the ALJ erred in evaluating the opinion of State Agency physician Dr. Jacobs.

<u>Issue Four</u>:  Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

(Dkt. 21, Joint Stipulation ["JS"] at 2-3.)

A. **ISSUE ONE: Listing 1.02(A).**

**1. The Requirements of Listing 1.02(A).**

Plaintiff bears the burden to prove that he had an impairment that met or equaled one of the Commissioner's listed impairments, i.e., a condition so severe that it is per se disabling at Step Three of the sequential analysis. See 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpt. P, App. 1

Listing 1.02(A) is one of the listings describing impairments of the musculoskeletal system. To meet Listing 1.02(A), Plaintiff must satisfy all of the following four conditions:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by **[1]** gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability[2]) and **[2]** chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and **[3]** findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in **[4]** an inability to ambulate effectively, as defined in 1.00B2b. . . .

20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.02(A).

---

[2] Based on the Court's research, "subluxation" refers to an incomplete or partial dislocation of a joint or organ; "contracture" refers to a shortening or hardening of a muscle or joint; "fibrous ankylosis" is a fibrous connective tissue process which results in decreased range of motion, with symptoms including osseous tissue fusing two bones together, reducing mobility; and "joint instability" happens when tissues — such as muscles, ligaments, and bones — weaken.

The "inability to ambulate effectively" is defined in the cited regulation as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P. App. 1, Listing 1.00B2.b(1)-(2). Thus, the regulations provide a "general definition" in Listing 1.00B2.b(1) following by several examples of situations that may satisfy that definition in Listing 1.00B2.b(2).

1      **2. The ALJ's Findings.**

2          The ALJ considered whether Plaintiff's medically determinable physical

3   impairments met or equaled Listings 1.02 or 1.04.  AR 18.  The ALJ concluded

4   that they did not, reasoning as follows:

5              The claimant's impairments, considered singly and in combination,

6              do not meet or medically equal the criteria of any medical listing.  No

7              treating or examining physician has recorded findings equivalent in

8              severity to the criteria of any listed impairment, nor does the evidence

9              show medical findings that are the same or equivalent to those of any

10             listed impairment.

11  AR 18.

12          On initial consideration in 2014 and reconsideration in April 2015, the state

13  agency consultants found that Plaintiff did not meet Listing 1.04, but they did not

14  consider Listing 1.02.  AR 71, 84.

15     **3. Analysis of Claimed Error.**

16          Plaintiff argues that his bilateral hip osteoarthritis meets Listing 1.02(A), and

17  that the ALJ's contrary finding lacks support of substantial evidence.  (JS at 4.)

18  Defendant counters that Plaintiff has failed to show three of the four required

19  elements: (1) gross anatomical deformity; (2) medically acceptable imaging of

20  joint space narrowing, bony destruction, or ankyloses of the affected joint (i.e., his

21  hips); and (3) the inability to ambulate effectively.  (JS at 8.)

22                    a.  Gross Anatomical Deformity.

23          The regulations do not define a "gross anatomical deformity."  Based on the

24  examples provided (see note 2, above) and dictionary definitions, the Court

25  understands "gross anatomical deformity" to refer to a body part (such as a bone,

26  muscle, or joint) that is misshaped in a significant way.

27          In support of his argument that he suffers from a gross anatomical deformity,

28  Plaintiff cites the following medical records: "See AR 821-822 (x-ray of right hip),

840 (MRI of right hip), 1097 (x-ray of right hip), and 1099-1100 (x-ray of right hip)." (JS at 4.) These records are summarized as follows:

• AR 821-22: In June 2015, Plaintiff's doctor ordered an x-ray of his right hip when he complained of "rt hip pain after fall." AR 821; see also AR 832 (describing fall caused by pain after a single vehicle car accident). The x-ray was interpreted as revealing a likely femur fracture, as follows: "There is a linear area of sclerosis[3] in the right femoral neck and irregularity of the cortex of the lateral right femoral neck highly suspicious for an impacted fracture of the right femoral neck. … The joint spaces of the hips are preserved." AR 821-22.

• AR 840: The above-described x-rays were followed by an MRI the same day that revealed "no evidence for acute fracture." The MRI was interpreted as showing "cam morphology of the proximal right femur which can predispose to femoral acetabular impingement.[4] Mild degenerative arthrosis of the right hip." Plaintiff's doctors concluded that the "acetabular defect is likely not a fracture [but] even if it were …, management would be non-operable; discharge on crutches, f/u DOI clinic." AR 838.

• AR 1097: This is a record from a November 2015 physical exam at Kaiser.

_____

[3] Bone sclerosis, or osteosclerosis, "is characterized by abnormal hardening of bone and an elevation in bone density." See https://en.wikipedia.org/wiki/Osteosclerosis.

[4] "Femoroacetabular impingement (FAI), also known as hip impingement, is a mechanical or structural disorder of the hip. … In the healthy hip, the rounded top of thigh bone (femoral head) 'plugs into' the hip socket (acetabular socket) in such a way that the femoral head can move smoothly within the socket. … Hip impingement occurs when something prevents the smooth, painless, and free movement of the ball-and-socket joint. … Cam impingement occurs because the ball-shaped end of the femur (femoral head) is not perfectly round. This interferes with the femoral head's ability to move smoothly within the hip socket." See https://www.ortho.wustl.edu/content/Patient-Care/3206/Services/Hip-Knee/Adult-Reconstruction-and-Hip-Preservation-Overview/Hip-Impingement.aspx.

The doctor noted, "Standard x-ray series of the right hip were reviewed by me today and demonstrated mild osteoarthritis. [Plaintiff] is a 30-year-old male who has persistent pain with mild osteoarthritis. Recommend repeat MRI to rule out pathology, notably AVN[5] given his level of pain." AR 1097-98.

• AR 1099-110: A few days later, Plaintiff underwent another MRI of his right hip. The findings for this MRI was as follows:

> No evidence for fracture, femoral head avascular necrosis or other worrisome osseous lesion. Hip joint normally located. Similar to the previous study, cam morphology of femoral head/neck junction which is most pronounced laterally where there is also an osseous dysplastic bump.[6] No significant acetabular retroversion.[7] Mild degenerative arthrosis of the hip similar to the reference study. No significant hip joint effusion.[8] … Visualized musculature is normal in bulk.

AR 1099-1100. The concluding impression was "Mild degenerative arthrosis of the hip similar to reference exam." AR 1100.

Plaintiff does not explain how any of these imaging studies reveal a gross

---

[5] AVN, or avascular necrosis, is "a condition that happens when there's loss of blood to the bone," causing the bone tissue to die. See https://www.webmd.com/arthritis/qa/what-is-avascular-necrosis-avn.

[6] Dysplasia refers to an "abnormal growth." See https://www.merriam-webster.com/dictionary/dysplastic.

[7] Acetabular retroversion refers to a kind of hip dysplasia that occurs when the acetabulum has a retroverted orientation. This "may give rise to problems of impingement between the femoral neck and anterior acetabular edge." See https://www.ncbi.nlm.nih.gov/m/pubmed/10204935/.

[8] "Hip effusion is characterized by an abnormal fluid accumulation in the joint space that leads to swelling and pain of the hip joint." See https://www.belmarrahealth.com/hip-effusion-causes-symptoms-treatment-exercises/.

anatomical deformity.  The June 2015 x-ray showed an area of bone thickening which, coupled with Plaintiff's report of a fall, caused his doctors to suspect a bone fracture – a suspicion subsequently ruled out by an MRI.  Even if he had a bone fracture, Plaintiff presents no argument that a bone fracture – a condition expected to heal – would constitute a "gross anatomical deformity" under the Listings.

It is unclear if Plaintiff contends that a "cam morphology" or an "osseous dysplastic bump" constitute a gross anatomical deformity.  If so, Plaintiff has failed to support his argument with cites to the record, legal argument, or expert opinion, despite bearing the burden at Step Three to demonstrate that his conditions met or exceeded the severity of Listing 1.02(A).  The fact that both MRIs showed "cam morphology" that could "predispose" Plaintiff to FAI suggests that Plaintiff was not suffering from FAI at the time of the studies.  AR 840, 1100.

### b.  Medically Acceptable Imaging.

As evidence that he obtained "medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint," Plaintiff cites the same four sets of x-rays/MRIs.  (JS at 5.)

Plaintiff does not identify any discussion in these records of "joint space narrowing."  To the contrary, the x-rays showed that the "joint spaces of the hips are preserved."  AR 822.  Regarding "bony destruction," the records showed no fractures and "no acute osseous abnormalities."  AR 1100.  The records do not mention "ankyloses."  Again, Plaintiff has not met his burden of explaining how he met or equaled Listing 1.02(A) based on the cited records.

### c.  Inability to Ambulate Effectively.

Plaintiff uses a hand-held, single point cane to ambulate.  AR 19, 215.  The regulations clearly state that this, alone, does not meet the general definition of the inability to ambulate effectively.  20 C.F.R. Pt. 404, Subpt. P. App. 1, Listing 1.00B2.b(1) ("Ineffective ambulation is defined generally as having insufficient lower extremity functioning … to permit independent ambulation without the use

9

of a hand-held assistive device(s) that limits the functioning of ***both*** upper extremities.") (emphasis added).

Plaintiff argues that since the examples in Listing 1.00B2.b are independent scenarios, if he meets any one of them, then he cannot ambulate effectively. (JS at 6.) Plaintiff argues that he cannot "walk a block at a reasonable pace on rough or uneven surfaces." (Id.) As support, Plaintiff cites (1) the RFC restriction against walking on uneven surfaces during work, and (2) various medical records reporting that he has an "antalgic" gait. (JS at 5-6, citing AR 19-20 [RFC findings] and AR 385, 464, 475, 615, 838, 868, 798, 1097, 1010, 1130, 1585, 1610 [medical records].)

Defendant counters by citing multiple cases holding that an RFC restriction against walking on uneven surfaces is not a finding that the claimant cannot do so. (JS at 9-10, citing, e.g., Moreno v. Astrue, 444 Fed. App'x 163, 164 (9th Cir. 2011) (holding RFC that limited claimant to walking on even terrain did not establish inability to ambulate effectively under the listings, because "the RFC did not state that Moreno was incapable of walking on uneven surfaces, only that he should avoid doing so in his employment"). Defendant also cites to medical records that reported Plaintiff had a "normal" gait (JS at 10, citing AR 378, 411, 458, 634, 761, 954, 1269, 1450) and that he could walk sufficiently well to carry out daily activities such as walking his dogs, shopping, and attending medical appointments (id., citing AR 21, 213, 215-16, 222, 224-25); see AR 614 ("taking care of 5 dogs").

The ALJ found that Plaintiff did not meet his burden at Step Three because no medical findings or other evidence showed that Plaintiff's functional impairment was as great as described by the Listings. AR 18. Plaintiff fails to demonstrate that this was legal error. While he points to medical evidence that he had some difficulty walking and used a cane, other medical evidence suggests that his difficulty was not so severe as to constitute an "extreme limitation" on his

ability to walk. For example, in November 2014, per Plaintiff's mother, he walked his dogs for ten minutes three times every day. AR 213, 222. He went shopping two or three times each week. AR 215. In May 2014, he told Kaiser Permanente that he was able to do physical therapy exercises "at gym 45-60 minutes" but was "not doing much yoga." AR 406. His exercise consisted of "3-4 days a week treadmill and [elliptical] up to 15% incline, 30-45 min." Id. Around that same time in 2014, he had "normal stance; gait normal." AR 408. In January 2015, Kaiser noted, "Physical therapy here too irritable to progress." AR 468. In February 2015, he told Kaiser, "Not walking as much [as] he was doing. Is walking less than a mile." AR 461. In May 2015, Kasier noted, "normal tandem gait." AR 761. These medical observations are inconsistent with an "extreme limitation" on Plaintiff's ability to walk that would satisfy the Listings and establish presumptive disability.

B. **ISSUE TWO: Listing 1.04(A).**

Listing 1.04(A) requires the following six elements:

1.04 **[1]** Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in **[2]** compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of **[3]** nerve root compression characterized by neuro-anatomic distribution of pain, **[4]** limitation of motion of the spine, **[5]** motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, **[6]** if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 CFR 404, Subpt. P, App. 1, Listing 1.04(A).

### 1. Compromise of a Nerve Root or the Spinal Cord.

Plaintiff contends that he meets this first requirement because MRIs of his lumbar spine from July 23, 2014, and May 29, 2015, show central spinal canal narrowing. (JS at 11-12, citing AR 510, 786-787.)

The July 2014 MRI explains that the test was ordered to determine whether "S1 nerve root involvement" was causing Plaintiff's back pain and calf atrophy. AR 510. The doctors made findings associated with the vertebrae at each level of Plaintiff's lumbar spine. The final impression was, "mild lumbar spondylosis superimposed on congenital spinal stenosis …. No definite compressive lesion on the right S1 spinal nerve." Id. In January 2015, Plaintiff's doctors at Kaiser described this MRI as follows: "An MRI of his lumbar spine was unremarkable at all levels." AR 463.

The second lumbar MRI in May 2015 had findings at all levels that were either minimal or unremarkable, with the spinal canal generally appearing "patent," meaning open or unobstructed. AR 787. At one level, "minimal degree central spinal canal narrowing" was noted. Id.

Plaintiff does not discuss the content of these records or explain how they show "compromise" of his spinal cord. Presumably one may have a mildly narrowed spinal canal without a compromised spinal cord. Plaintiff presents no arguments or medical evidence to the contrary. Plaintiff does not explain how these MRIs' "unremarkable" and "minimal" findings show that his impairments are so severe that he meets a Listing. Based on the first element, Plaintiff fails to demonstrate legal error in the ALJ's conclusion that he did not meet Listing 1.04.

### 2. Straight Leg Raising Tests.

The parties' briefing focuses on this sixth element of Listing 1.04. Plaintiff contends that he "had a positive straight-leg raising test at AR 470, 472, and 798." (JS at 12.) Defendant counters that these records do not establish positive results in the sitting **and** supine position, as the Listing requires. (Id. at 14.) Plaintiff also

had negative straight-leg raising tests.  (Id., citing AR 312, 458, 761, 1450.)

The records cited by Plaintiff are summarized as follows:

• AR 470 (1/20/15): Describes the results of one straight-leg raising ("SLR") test without stating whether it was conducted in the seated or supine position. Plaintiff raised his left leg to 40° and his right leg to 30°.[9]

• AR 472 (1/20/15): Describes the results of a "Slump/SLR Supine" test as "+R" presumably meaning positive on the right side.  This is consistent with "SLUMP" test results from the same day at AR 470.

• AR 798 (5/26/15): This record states, "+bilat SLR to 400 degrees."  This presumably means Plaintiff had positive SLR test results on both legs.  It is unclear if the "400 degrees" is an error and perhaps Kaiser meant 40 degrees.  The record does not state whether the test was seated or supine.  A few days earlier on 5/14/15, Kaiser recorded "negative" results bilaterally on the SLR test.  AR 761.

The best interpretation of the records at AR 470-72 is that on January 20, 2015, Kaiser administered two SLR tests: one supine and one in a seated/slumped position.  Both tests had positive results.  The Court, therefore, does not base its ruling on Issue Two on the alleged lack of adequate SLR test evidence.

C. **ISSUE THREE: Dr. Jacobs.**

**1. Relevant Administrative Proceedings.**

On initial review in December 2014, state agency consultant Dr. Jacobs opined that Plaintiff should "avoid even moderate exposure" to noise, among other limitations.  AR 73.  The ALJ summarized Dr. Jacobs's opinions and gave them "partial" weight, because they failed "to fully consider the claimant's subjective allegations of back pain, and difficulty ambulating due to hip pain and

---

[9] Plaintiff's briefing does not address what constitutes a positive test result. Online sources suggest that an SLR test is positive if the patient experiences pain at 40 degrees of hip flexion or less.  See, e.g., https://www.thestudentphysicaltherapist.com/straight-leg-raise-test.html.

radiculopathy," and because Dr. Jacobs "did not have the benefit of considering the additional evidence that was only available at the reconsideration and hearing level." AR 24. In the ALJ's summary, the ALJ incorrectly stated that Dr. Jacobs opined Plaintiff was precluded from "concentrated" exposure to noise (id.), when his actual opinion was that Plaintiff should avoid "even moderate" exposure to noise (AR 73).

On reconsideration in April 2015, state agency consultant Dr. Estrin found that Plaintiff needed to "avoid concentrated exposure" to noise. AR 86. The ALJ accorded "significant weight" to Dr. Estrin's opinion because it considered Plaintiff's subjective complaints, considered the combined effects of Plaintiff's impairments, and was "well supported" by the medical evidence. AR 24.

Ultimately, however, the ALJ's RFC did not include any limitations on workplace noise exposure. AR 19-20. The ALJ restricted Plaintiff against "performing work requiring binaural or perfect hearing, meaning acute hearing or jobs that require a hearing test." AR 19. The ALJ found that Plaintiff did not suffer from "disabling hearing loss," because his medical records showed that his hearing improved after implantation of the BAHA device and he responded to questions at the hearing with no sign of "auditory difficulty." AR 21.

The Selected Characteristics of Occupations Defined in the Revised DOT classifies occupational noise intensity of jobs using a five-level scale, as follows:

| Code | Level | Illustrative Examples |
|------|-------|----------------------|
| 1 | Very Quiet | Isolation booth for hearing test; deep sea diving; forest trail |
| 2 | Quiet | Library; many private offices; funeral reception; golf course; art museum |
| 3 | Moderate | Business office where type-writers are used; department store; grocery store; light traffic; fast food restaurant at |

| | | |
|---|---|---|
| | | off-hours |
| 4 | Loud | Can manufacturing department; large earth-moving equipment; heavy traffic |
| 5 | Very Loud | Rock concert – front row; jack-hammer in operation; rocket engine testing area during test |

The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix D (1993). The DOT rates all three jobs that the ALJ found Plaintiff could perform (per AR 27) as involving level 3 ("moderate") noise exposure. See DOT 209.587-010 (addresser), DOT 219.587-010 (ticket checker), DOT 713.687-026 (lens inserter).

**2. Summary of Relevant Evidence.**

The evidence of Plaintiff's hearing impairment – the only condition identified in the briefing as potentially relevant to his tolerance for workplace noise (JS at 18) – includes the following:

• AR 439 (5/29/14): Plaintiff underwent speech reception threshold ("SRT") testing. His right ear was rated "NR" (possibly "no results"), while his left ear was rated 25. The test notes say, "significant improvement in left ear responses with reinstruction. … Speech reception poorer than what would be expected …." The overall test result circled is "fair."

• AR 346-47 (7/7/14): Plaintiff was diagnosed with "profound" right-ear hearing loss due to a "severe ear infection" and "moderate hearing loss in the left ear." AR 347. His prognosis with treatment was "good," and he was scheduled for surgery at Kaiser. Id.; see also AR 654 (discussing perforated right ear drum).

• AR 437-38 (10/9/14): In more SRT testing, Plaintiff's right ear was rated "NR," while his left ear was rated 20. The overall test result circled is "good."

• AR 217, 227 (11/25/14): Neither Plaintiff nor his mother checked the box to indicate that he has impaired "hearing." He reported that he could follow

15

spoken instructions "very well." AR 227.

    • <u>AR 69</u> (12/16/14): Dr. Jacobs reviewed Plaintiff's medical records and concluded, "deaf in RT ear on 10/14/15."

    • <u>AR 89</u> (3/23/15): This is the date of the last medical record reviewed by Dr. Estrin before she issued her 4/20/15 opinion.

    • <u>AR 540</u> (4/1/15): Plaintiff had surgery to implant a hearing aid. Plaintiff was advised, "the implant will not restore hearing in the affected ear" and "the goal is to route sounds from the affected side to the good/functional ear." AR 551.

    • <u>AR 630-31</u> (4/9/15): Plaintiff underwent a physical exam. As to both his right and left ears, "no decreased hearing [was] noted."

    • <u>AR 660</u> (4/13/15): Plaintiff had a post-operative appointment to remove his sutures.

    • <u>AR 914</u> (8/26/15): Plaintiff told doctors, "he was assaulted by his elderly demented neighbor last night … and hit several times with a heavy metal cane. [Patient] has implantable pronto hearing aid to right scalp and reports cane hit directly onto it, which caused it to shatter. … [Patient] also reports he was on the ground and man continued to attack him, held up arms and was hit several times to back of right forearm/elbow." He had an appointment later that afternoon to address his broken hearing aid.

    • <u>AR 1072</u> (10/27/15): Doctors observed a "pearl" on Plaintiff's tympanic membrane of his right ear.

    • <u>AR 1308</u> (2/4/16): Plaintiff reported that he was "assaulted" again on this date. He claimed at the hearing that the assault was perpetrated by a drunk man who broke into Plaintiff's house. AR 46. On 2/16/16, he advised Kaiser that he was "having surgery on Weds. for my eardrum and they are going to reset my nose (which was broken in the assault) then as well." Regarding damage to his hearing aid, he explained, "My post was slammed into concrete and there is severe swelling around the post. I was not wearing the hearing aid during the assault but I

can't get the hearing aid to attach to the post. Dr. Bromberg is operating on my right ear drum (to address the cyst under the skin graft) on Weds. 2/17/16 ...." AR 1307.

• <u>AR 1332</u> (2/17/16): Plaintiff underwent surgery to remove "right tympanic membrane cyst."

• <u>AR 1597</u> (10/10/16): Plaintiff reported that he was "assaulted 1 year ago" resulting in damage to his implant ("one processor broke") and swelling. He expressed concern "that his left hearing has decreased." He was instructed to "follow up with HearUSA for troubleshooting and audiogram."

• <u>AR 1665</u> (12/21/16): Plaintiff requested an appointment because he felt "sharp pain" upon blowing his nose and "his left ear is a little bloody."

• <u>AR 1668</u> (12/22/16): Plaintiff complained of ear pain, discharge, and popping, including that his "left ear popped before Thanksgiving (while on plane)."

• <u>AR 1678</u> (12/29/16): At his appointment, Kaiser doctors examined his ears and diagnosed him with bilateral "otalgia," meaning ear pain.

The Court did not see (and the parties did not cite) any hearing tests administered after Plaintiff's implant surgery. No doctors other than the state agency consultants offered opinions about the maximum workplace noise level in which Plaintiff could function.

### 3. Analysis of Claimed Error.

Plaintiff argues that the ALJ failed to give a legally sufficient reason for discounting Dr. Jacobs's opinion that Plaintiff should avoid even "moderate" workplace noise exposure. (JS at 16.) Defendant counters that (1) the ALJ gave legally sufficient reasons for crediting Dr. Estrin's opinion over that of Dr. Jacobs, (2) Dr. Estrin opined that Plaintiff only needed to avoid "concentrated" exposure to noise, and (3) there is no evidence that the three alternative jobs would expose Plaintiff to "concentrated" noise. (JS at 17.)

The Court agrees that the ALJ gave a specific, legitimate reason supported by substantial evidence for generally giving Dr. Estrin's opinions more weight than those of Dr. Jacob, i.e., Dr. Estrin had more medical evidence to consider. As summarized above, however, (1) even Dr. Estrin did not have records from or after Plaintiff's April 2015 implant surgery, and (2) the ALJ, despite giving "significant weight" to Dr. Estrin's opinion, did not include in the RFC Dr. Estrin's opinion that Plaintiff should avoid "concentrated" exposure to workplace noise.

Dr. Jacobs's and Dr. Estrin's opinions regarding noise exposure are worded differently, but the different words may not signify a different meaning. It is unclear what Dr. Estrin meant by "concentrated" exposure, because that is not a term defined by the regulations or the DOT. In at least one earlier case, a "VE testified that he construed the ALJ's determination that plaintiff avoid 'concentrated' noise to be commensurate with a restriction from 'moderate' noise as defined by" the DOT. Babick v. Comm'r of Soc. Sec., 2015 U.S. Dist. LEXIS 110455, at *10-11 (E.D. Cal. Aug. 20, 2015). If those terms mean the same thing, then both state agency physicians opined that Plaintiff should avoid workplace exposure to moderate noise, but the ALJ found that Plaintiff could do jobs requiring exposure to moderate noise.

In Lynn v. Astrue, 2009 U.S. Dist. LEXIS 115173, at *7-9 (S.D. Cal. Dec. 8, 2009), the ALJ restricted the claimant against "concentrated" exposure to noise, and the VE testified that she could do her past relevant work, all of which involved exposure to "moderate" noise per the DOT. The district court found error because the Commissioner bore the burden at Step Five, the ALJ never asked the VE about this potential inconsistency, and the Court could not determine whether avoiding "concentrated" noise was the same as avoiding "moderate" noise. Id.; but see Gorton v. Berryhill, No. ED CV 17-259-E, 2017 U.S. Dist. LEXIS 155522, at *5 (C.D. Cal. Sep. 21, 2017) (finding no inconsistency between VE's testimony that claimant restricted from "concentrated" noise could perform work requiring

18

"moderate" noise exposure).

Here, the VE did not testify about noise exposure. AR 60-63. The VE responded to a hypothetical question that contained no restriction on workplace noise, so his testimony about what jobs a hypothetical worker with the specified restrictions could do did not conflict with the DOT's noise exposure ratings. AR 60-62. This case, therefore, presents facts different from <u>Lynn</u> and <u>Gorton</u>.

Defendant urges the Court to find that if the ALJ erred by not including a restriction against noise exposure in the RFC, then any error was harmless, because substantial evidence supports the ALJ's finding that Plaintiff can do jobs that require "moderate" noise exposure. (JS at 17.)

Ultimately, the ALJ did not give a reason for failing to include Dr. Estrin's limitation against "concentrated" noise exposure in the RFC. The ALJ never discussed why the medical evidence did not support some restriction against workplace noise. This omission may have been inadvertent (because the ALJ gave significant weight to Dr. Estrin's opinions) or intentional (because the ALJ determined that restricting Plaintiff against work requiring acute hearing adequately accommodated his hearing impairment). Either way, the Court cannot conclude that the omission was harmless. If "concentrated" exposure is the same as "moderate" exposure (which is unclear, but which must be considered in the light most favorable to Plaintiff in this harmless error analysis concerning Step Five findings, where the Commissioner bears the burden), then the only two medical sources to offer opinions on this subject restricted Plaintiff against working in an environment with "moderate" noise. On remand, the ALJ may either give legally appropriate reasons for not modifying the RFC or modify the RFC and obtain new vocational testimony.

D. **ISSUE FOUR: Plaintiff's Subjective Symptom Testimony.**

### 1. Summary of Relevant Subjective Symptom Testimony.

At the hearing on March 21, 2017, Plaintiff testified that his mother comes

over every day to help him.  AR 48.  She "helps [him] get out of bed."  Id.  She

does household chores and picks up groceries.  Id.  When asked, "So your mom

does everything for you.  She does the cooking, the cleaning, the shopping,

everything?" he answered, "Everything, yes.  And if it's not her, it's my partner

who does it."  AR 50.  The following exchange about Plaintiff's typical daily

activities also occurred:

> Q.    Do you ever go out of the house or do anything?  Go to the
>        movies . . . go to the park?
>
> A.    No.  Not really.  I go outside to walk a little bit and I go back in.
>
> Q.    What do you do on a daily basis?  You wake up and then what
>        happens?
>
> A.    I get up. I brush my teeth, usually my mom has to help me or
>        Todd helps me out of bed.  And I do my stretches.  I take a
>        shower and … I either sit there for a little bit or I go and I lay
>        back down.  The medication makes me sleep all day.

AR 54.

### 2.  The ALJ's Evaluation of Plaintiff's Testimony.

The ALJ found that Plaintiff's allegations concerning "the intensity,

persistence and limiting effects of his symptoms are not completely consistent with

the totality of the evidence."  AR 21.  To support this conclusion, the ALJ

discussed Plaintiff's hearing testimony, summarized above, as follows:

> The claimant testified that he had minimal activities of daily
> living due to his impairments.  The claimant alleged he had had
> difficulty even getting out of bed and he asserted that he does not go
> out of his home.  The records suggest the claimant may have
> overstated the limitations caused by his impairments because it
> appears that he may be out and about more than he alleges.  The
> evidence shows the claimant walked his dogs multiple times a day

20

(AR 222). The record shows the claimant was assaulted in February

2016 (AR 1277). In addition, the evidence confirms the claimant was

in a motor vehicle accidents in June 2015 and May 2016. This

suggests the claimant left his home more often than he claimed, and

indicates he had greater activities of daily living than he asserted.

AR 21.

### 3. Analysis of Claimed Error.

Plaintiff argues that the ALJ did not identify any true inconsistencies or lies

and therefore failed to give legally sufficient reasons for discounting his subjective

symptom testimony. (JS at 19.)

Regarding his daily activities, he points out that he did not testify, as the

ALJ summarized, that "he does not go out of his home." (Id., citing AR 21.)

Rather, he testified that he did not "really" go out of his house to do things except

to "walk a little bit." AR 54. While the ALJ did not summarize his testimony

verbatim, even with this slight correction, the ALJ's logic stands. The ALJ found

that Plaintiff overstated the limitations caused by his impairments, because

evidence in the record showed "he may be out and about more than he alleges."

AR 21.

Regarding his activities, Plaintiff argues that being assaulted did not show

that he left his house, because the February 2016 assault happened inside his house

when an intruder broke in. (JS at 19, citing AR 46.) It is, however, unclear how

Plaintiff's head was "slammed into concrete" inside his home. AR 1307. A

different doctor's note dated February 5, 2016, states that Plaintiff was attacked by

a "neighbor" who kicked him in the face. AR 1277. Another note states that a

"friend/caregiver of his neighbor" assaulted Plaintiff at his home. AR 1317. Yet

another note claims that Plaintiff was "slammed into a wall striking his shoulder."

AR 1477. Plaintiff was also the victim of an earlier assault by a neighbor. In

August 2015, Plaintiff told doctors he was "helping a friend with dementia and was

hit in the right side of his head with a cane along with his right elbow." AR 913-14; see also AR 929 (stating that Plaintiff was assaulted by man with dementia "who he was helping take care of while his wife is in Texas"). This description suggests that he was out of his house helping his neighbor.

Plaintiff argues that being in "two car accidents is entirely consistent with someone who leaves home to go to doctor's appointments." (JS at 19.) In July 2014, he reported that he went on a trip to South Carolina and slipped out of a truck. AR 382. In September 2014, he reported that he had been doing a "lot of driving," although his right leg pain could interfere with a long drive. AR 362. In November 2014, Plaintiff could drive. AR 224. His doctor notified the DMV that his license should be revoked in January 2015. AR 473; AR 475 ("can hardly drive, brake, but had no problems driving here"); AR 440 (2/18/15 DMV order of suspension/revocation). In April 2015, a doctor assessed he was "probably capable of driving," and Plaintiff secured DMV forms to retake the driving test. AR 707. In May 2015, he was involved in a car accident "where the wheel came off and hit his pelvis."[10] AR 880 (6/10/15 Kaiser record); compare AR 832 (On 6/4/15, Plaintiff told doctors that on May 20, 2015, "the wheel on his vehicle came off and the car pitched up onto its front bumper and then slammed down. … Since then has been having intermittent stabbing pain in his RIGHT hip …. 2 days ago he had [one of these] pains descending concrete steps and his home and he fell directly onto his RIGHT hip."). In May 2016, he "was in a car with somebody and their car flipped." AR 45-46. The record also contains other evidence that Plaintiff

---

[10] It is unclear if Plaintiff meant that the *steering* wheel came off and hit his pelvis or that a tire/wheel came off and hit his pelvis (which would mean that he was not riding in the car at the time of the accident). This is especially odd given that another doctor's note states that Plaintiff was in the front passenger seat and that he struck the left side of his head. AR 797. Another note states that the tire fell off of the car. AR 817.

traveled for purposes other than medical appointments.  See AR 1516 (Plaintiff wanted to reschedule a 5/5/16 appointment because he would be "out of town [intermittently] until 5/28"); AR 1668 (Plaintiff took a plane flight around Thanksgiving 2016); AR 1669 (Plaintiff needed to fly for a family emergency in December 2016).

Plaintiff does not address why his testimony that he goes "outside to walk a little bit" is not inconsistent with his Function Report and the Function Report completed by his mother, in which they reported that (1) he regularly walks six dogs, taking them on a 10-minute walk three times each day (AR 213, 222) or (2) his mother drives him to stores 2 or 3 times each week (AR 215).  In May 2014, his exercise consisted of "3-4 days a week treadmill and elliptical up to 15% incline, 30-45 min."  AR 406.

The ALJ's conclusion, i.e., that Plaintiff exaggerated the degree of his impairment at the hearing because his activity testimony was inconsistent with activities reflected in his medical records, is supported by the administrative record.  This was a clear and convincing reason to discount Plaintiff's subjective symptom testimony.  See Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014) ("Fngaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination.").

Furthermore, the ALJ gave other clear and convincing reasons to discount his testimony, making any error harmless.  As demonstrated by the records cited above, Plaintiff's extreme complaints are inconsistent with the relatively mild objective evidence; MRIs and X-rays were "generally benign."  See AR 21 (citing inconsistency).  Similarly, Plaintiff's complaints were inconsistent with the conservative treatment he received for his complaints; Plaintiff's hip and back pain were treated with pain medication, muscle relaxers, and physical therapy, and he either responded to those treatments or did not request or obtain different treatment.  See AR 23-24 (citing AR 282-89, 302, 319, 325, 868 [in June 2015, "I

offered the patient acute rehabilitation . . ., but the patient declined. . . . Rx given for motrin and norco.  Crutches and teaching provided."), 1575-76, 1610, 1701-05; see also Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of an impairment.").

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered REVERSING the decision of the Commissioner and REMANDING this case for further administrative proceedings consistent with this opinion.


DATED:  <u>April 26, 2019</u>

_____
KAREN E. SCOTT
United States Magistrate Judge